BOSHWIT BROTHERS, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Boshwit Bros., Inc. v. Commissioner
Docket Nos. 12193-77, 3839-80, 3840-80, 3841-80.
United States Tax Court
T.C. Memo 1982-156; 1982 Tax Ct. Memo LEXIS 586; 43 T.C.M. (CCH) 906; T.C.M. (RIA) 82156; March 29, 1982. Hubert A. McBride and James T. Bland, Jr., for the petitioners. James E. Keeton, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioners' Federal income tax as follows: Petitioner(s)
Year
Deficiency
Boshwit Brothers, Inc.
1973
$ 14,753.86
1974
7,337.16
1975
7,683.00
Avrome H. Boshwit and
1975
41,639.00
Mary E. Boshwit
1976
1,366.50
Buck Boshwit and
1975
50,262.00
Judith S. Boshwit
1976
4,508.00
These cases are consolidated for trial, briefing, and opinion. After concessions, the following issues remain for decision: (1) whether Avrome H. Boshwit received unreported dividends from Boshwit Brothers, Inc., in 1975, [2]
(2) whether *590 Buck Boshwit received unreported dividends from Boshwit Brothers, Inc. in 1975 and 1976, (3) whether Buck Boshwit is entitled to an interest deduction in 1976, (4) whether Boshwit Brothers, Inc., is liable for accumulated earnings tax for 1973, 1974, and 1975, and (5) whether Buck Boshwit derived any "personal service income" in 1976 from a subdivision he developed. GENERAL FINDINGS OF FACT Some facts have been stipulated and are found accordingly. When their respective petitions were filed herein, Boshwit Brothers, Inc.'s principal place of business and the remaining petitioners' residences were in Memphis, Tenn. Boshwit Brothers, Inc. (hereinafter the corporation) is a Tennessee corporation formed in 1936. Its primary business in buying, selling, renting, and owning real estate. At all times relevant herein, Avrome H. Boshwit owned 61.1 percent of the corporation's stock; Buck Boshwit and Jane Horton, Avrome H. Boshwit's children, owned 8.2 percent each; and five grandchildren owned 4.5 percent each. Although Avrome H. Boshwit was the corporation's president, Buck Boshwit, as vice-president and secretary, actually ran the business. Issue 1. Dividend Income *591 to Avrome H. Boshwit
FINDINGS OF FACT During 1975 and years prior and subsequent thereto, the corporation maintained an account entitled "A. H. Boshwit, Drawing." When the corporation paid an expense properly chargeable to Avrome H. Boshwit personally, the amount recorded as due the corporation from Avrome H. Boshwit was increased. Other amounts, such as monthly salary, served to reduce that amount. The following amounts are those recorded as owing from Avrome H. Boshwit to the corporation: Date
Amount
December 31, 1970
$ 61,782.10
December 31, 1971
56,690.76
December 31, 1972
22,740.27
December 31, 1973
24,935.35
December 31, 1974
21,060.48
December 31, 1975
28,590.85
December 31, 1976
[3] 27,398.6*
December 31, 1977
21,317.59
December 31, 1978
14,227.35
December 31, 1979
11,244.78
Thus, the amount owed increased by $ 7,530.37 during 1975. While Avrome H. Boshwit's account was treated by the corporation as an account receivable, no formal agreement or note memorializing any debt existed, no repayment date was established, and no interest was paid. *592 Nevertheless, Avrome H. Boshwit considered the drawing account balance his debt and fully intended to repay it. In his statutory notice of deficiency, respondent determined the increase in the drawing account balance during 1975 was a dividend to Avrome H. Boshwit. OPINION At issue is whether the net increase in Avrome H. Boshwit's drawing account during 1975 was a dividend to him or a loan to him. Whether a corporation's distributions to its shareholders constitute dividends or bona-fide loans is a question of fact. Electric & Neon, Inc.v. Commissioner,56 T.C. 1324 (1971), affd. per curiam 496 F.2d 876 (5th Cir. 1974); Kaplan v. Commissioner,43 T.C. 580 (1965). Respondent maintains the absence of a note, a formal payment arrangement, interest charges, or a specific due date belies any true debtor-creditor relationship. Petitioner Avrome H. Boshwit, pointing to regular credits (payments) on the account and the general decrease in the account balance over the years, argues a true loan existed. We agree with petitioner Avrome H. *593 Boshwit. The crucial inquiry is whether a bona fide loan existed. Paramount to that inquiry is whether there was an actual intent to repay. McLemore v. Commissioner,494 F.2d 1350 (6th Cir. 1974), affg. a Memorandum Opinion of this Court. Stated simply, we believe Avrome H. Boshwit's testimony that he intended to repay any amounts advanced to him. [4] Credibility is added to his testimony, albeit self-serving, by an examination of the account which reveals regular credits and a generally decreasing balance. Issue 2. Dividend Income to Buck Boshwit
FINDINGS OF FACT The corporation is the owner and beneficiary of two life insurance policies on Buck Boshwit's life. One was issued by the United States Life Insurance Company with a $ 200,000 face amount. The other was issued by The Union Central Life Insurance Company with a $ 100,000 face amount. During 1975, the corporation borrowed $ 21,642.60 and $ 25,100.00 on the cash surrender values of the United States and Union Central policies, respectively. The borrowed amounts, totaling $ 46,742.60, were distributed *594 to petitioner Buck Boshwit. No corporate purpose was served by such distribution. Nor was any note or other written agreement executed indicating the distributed amounts were to be repaid. At the time of trial, no amount had been repaid. However, the corporation maintained an account entitled "Notes Receivable - Buck Boshwit" in which it recorded the $ 46,742.60 distributed amount, and Buck Boshwit paid the interest due the insurance companies on the loans. During 1975, the corporation distributed $ 7,110.41 to petitioner Buck Boshwit and recorded it in the "Notes Receivable - Buck Boshwit Account" noted above. Petitioner Buck Boshwit owned three life insurance policies on his own life: a John Hancock Mutual Life Insurance policy (face $ 50,000); an Equitable Life Insurance Company policy (face $ 150,000), and a Union Central Life Insurance Company policy (face $ 50,000). During 1975 and 1976, the corporation paid premiums on those policies totaling $ 3,958.89 and $ 3,808.11, respectively. Those amounts were recorded by the corporation as owing from Buck Boshwit in an account titled "Notes Receivable - R. B. Boshwit, Life Insurance." On December 10, 1963, Buck Boshwit *595 executed the following note: I, BUCK BOSHWIT, the owner of John Hancock Life Insurance Company policy #86-51454 do hereby agree with BOSHWIT BROS., INC. as follows: WHEREAS I have this day assigned said policy to the said BOSHWIT BROS., INC. to secure repayment of any loans made to me, NOW, THEREFORE, in consideration of such loans, in the amount of the annual premium, as may be made to me from year to year, without interest, I promise to pay to BOSHWIT BROS., INC. the full amount of such loans on demand without interest. Essentially identical notes were executed by Buck Boshwit on December 11, 1963, and on December 8, 1965, with respect to the Union Central and the Equitable Life Policies. The three policies owned by Buck Boshwit were collaterally assigned to the corporation during 1963 and 1964 to secure Buck Boshwit's repayment of premium payments made by the corporation. During 1975, $ 8,872.90 and $ 8,994.04 were borrowed against the cash surrender values of the John Hancock Mutual Life Insurance Company policy and the Union Central Life Insurance Company policy, respectively. Such amounts were received by Buck Boshwit even though the policies had been collaterally assigned *596 to the corporation. During 1976 and years prior and subsequent thereto, the corporation maintained an account entitled "R. Buck Boshwit" (hereinafter Buck Boshwit's drawing account). When the corporation paid an expense properly chargeable to Buck Boshwit, personally, the amount recorded as due the corporation from Buck Boshwit was increased. Other amounts, such as monthly salary, served to reduce that amount. The following amounts are those recorded as owing from Buck Boshwit to the corporation: Date
Amount [5]
December 31, 1970
$ 5,258.2*
December 31, 1971
5,064.80
December 31, 1972
3,255.47
December 31, 1973
10,385.53
December 31, 1974
9,033.36
December 31, 1975
8,939.31
December 31, 1976
9,179.23
December 31, 1977
10,***.**
December 31, 1978
10,262.7*
December 31, 1979
806.9*
Thus, during 1975, the account balanced decreased by $ 183.71, and, during 1976, the account balanced increased by $ 239.92. While Buck Boshwit's drawing account was treated by the corporation as an account receivable, there existed no formal agreement or note memorializing *597 any debt, no repayment date was established, and no interest was paid. However, Buck Boshwit considered the drawing account balance his debt and fully intended to repay it. In his statutory notice of deficiency, respondent determined the 1975 cash surrender value loans received by the corporation on policies it owned which were distributed to Buck Boshwit ($ 46,472.60); the $ 7,110.41 corporate distribution to Buck Boshwit in 1975; the premiums paid by the corporation on policies owned by Buck Boshwit ($ 3,958.98 in 1975 and $ 3,808.11 in 1976); the loans of $ 8,872.90 and $ 8,994.04 received by Buck Boshwit in 1975 against the cash surrender values of policies owned by him but collaterally assigned to the corporation; and the net increase of $ 239.92 in the balance of Buck Boshwit's drawing account in 1976 were dividends to Buck Boshwit. OPINION At issue is whether certain amounts were dividends or loans to Buck Boshwit from the corporation in 1975 and 1976. In 1975, the corporation borrowed a total of $ 46,742.60 against the cash surrender values of two life insurance policies owned by it on the life of Buck Boshwit. The $ 46,742.60 was distributed to Buck Boshwit. Buck *598 Boshwit, pointing to the recordation as a note receivable on the corporation's books and records and his payment of interest to the insurance companies, maintains the distribution was a loan rather than a dividend. We disagree. The only evidence supporting Buck Boshwit's testimony that he intended to repay the $ 46,742.60 is the corporate recordation and interest payments. No note or other formal evidence of indebtedness was executed, no interest was charged by the corporation itself, and no principal payments had been made at the time of trial. Moreover, we do not believe Buck Boshwit intended to repay the $ 46,742.60. Thus, we uphold respondent's determination that such amount was dividend income to Buck Boshwit in 1975. We reach the same result with respect to the $ 7,110.41 distributed to Buck Boshwit by the corporation in 1975. The only evidence supporting Buck Boshwit's assertion that such amount was a loan is the corporate recordation of it under notes receivable. We are unable to find any intent to repay. Thus, we sustain respondent's determination that the $ 7,110.41 distribution was a dividend to Buck Boshwit during 1975. We reach a different result as to the *599 corporate payments of premiums in 1975 and 1976 on life insurance policies owned by Buck Boshwit on his own life. Not only were such amounts recorded as notes receivable on the corporation's books and records, but actual notes were executed and Buck Boshwit collaterally assigned the policies to the corporation to cover any premium payments made by the corporation. We find Buck Boshwit's testimony that the premium payments were loans which he intended to repay to be supported by the evidence. Thus, we hold for petitioner Buck Boshwit with respect to the premium payments. During 1975, a total of $ 17,866.94 was borrowed against the cash surrender values of two of the policies owned by Buck Boshwit but collaterally assigned to the corporation. The proceeds of those loans went to Buck Boshwit. Respondent maintains the proceeds were the corporation's due to the collateral assignments and their receipt by Buck Boshwit constituted a dividend. Petitioner Buck Boshwit maintains the policies were his, the corporation only had a security interest, and he considered the loans against the cash surrender values to be personal obligations which he intended to repay. We find petitioner Buck *600 Boshwit's testimony credible in this instance and find for him on this issue. With respect to the 1976 net increase in the balance of Buck Boshwit's drawing account, we find such account represented a bona-fide loan which Buck Boshwit intended to repay. As with Avrome H. Boshwit's drawing account, even though formal evidences of indebtedness were absent and no interest was charged, the existence of regular payments and a generally declining balance support Buck Boshwit's testimony of an intent to repay. Issue 3. Interest Expense - Buck Boshwit
FINDINGS OF FACT During 1976, Buck Boshwit paid a total of $ 2,801.17 in interest to Union Central Life Insurance Company and United States Life Insurance Company with respect to the cash surrender value loans on policies owned by the corporation. [6]
In his statutory notice of deficiency, respondent disallowed Buck Boshwit's deduction for those interest payments on his 1976 Federal income tax return. OPINION At issue is the allowability of Buck Boshwit's deduction for interest payments on loans taken *601 against the cash surrender value of policies owned by the corporation on Buck Boshwit's life. Petitioner Buck Boshwit contends the loans were really to him and the obligation to pay interest was his own. Respondent contends the loans were the corporation's and the proceeds of the loans were distributed to Buck Boshwit as a dividend. Thus, he maintains the obligation to pay interest to the life insurance companies remained the corporation's. We agree with respondent. We have already found, supra pp. 9-10, the corporation distributed the proceeds of the loans taken against the cash surrender values of policies owned by it to Buck Boshwit as a dividend in 1975. Thus, even though Buck Boshwit ultimately received the loans's proceeds, the actual borrower was the corporation. It is fundamental that a section 163 interest expense deduction is allowable only to the actual interest obligor. Enoch v. Commissioner,57 T.C. 781 (1972). [7] Therefore, Buck Boshwit may not deduct his payment of the corporation's interest expense. *602 Issue 4. - Accumulated Earnings Tax
FINDINGS OF FACT Boshwit Brothers, Inc., (hereinafter the corporation) is primarily involved in buying, selling, renting, and owning real estate. During the years in issue, the corporation owned approximately 1500 rental units. Most of those units were located in undesirable and deteriorating areas of Memphis, Tenn. Those areas suffer a high crime rate. Prior to and during the years in issue, the corporation was cited frequently for violation of the city building code. Usually, the corporation only corrected deficiencies relating to basics, such as plumbing and electricity. Many, if not most, of the deficiencies in the corporation's property resulted from vandalism which was increasing during the years in issue. Vandalism was especially acute when a rental unit was vacant, and, as neighborhoods deteriorated, vacancy levels rose. While the corporate minutes routinely since 1946 state increasing repair and renovation costs as a reason not to pay dividends, the corporation made no written projection of what amounts would be necessary to repair and renovate its properties in the future. [8] Nor were any major repair or renovation *603 projects undertaken. [9]
Few of the corporation's properties were covered by fire and extended coverage insurance. The corporation was unable to get insurance at standard rates because of the properties' locations. Since obtaining insurance presented a prohibitive cost, petitioner decided, before the years in issue, to be come a self-insurer. Although no written program of self-insurance was adopted, [10] the corporation established two bank accounts to accumulate funds for self-insurance. One account, denominated the Insurance Reserve Fund, was at the Leader Federal Savings *604 & Loan Association, and the other account, denominated the Insurance Reserve Account, was at the First Federal Savings & Loan Association. During the years in issue fairly regular deposits were made to the Leader account. [11] The only withdrawals from that account during the years in issue totaled $ 20,000. That $ 20,000 was loaned to Boshwit Brothers Finance Corporation [12] which paid a higher interest rate than was paid by Leader on passbook savings. While no monies were withdrawn for self-insurance purposes, the corporation suffered no losses from fires during the years in issue. Subsequent to the years in issue, the corporation suffered net losses. [13] According to unaudited financial statements, those losses were as follows: *605 Year
Net Loss
1976
$ (44,649.94)
1977
(17,273.63)
1978
( 192.85)
1979
(12,335.11)
However, in 1973 and 1974, the corporate minutes reflected that the Chairman of the corporation's Board of Directors "was highly pleased with [the] operation and showing" made by the corporation. Even though net losses were reflected in 1976 through 1979, the corporation's current assets greatly exceeded its current liabilities during each of those years and during the years in issue. [14] Thus, according to the unaudited financial statements, working capital remained large as the following reflects: Year
Working Capital [15]
1973
$ 533,968
1974
550,486
1975
534,382
1976
547,680
1977
[16] 562,861
1978
396,659
1979
435,575
*606 In addition, the corporation's retained earnings exceeded $ 1,200,000 in every year from 1970 through 1979, and neared one and one-half million in 1979. [17]
In the early 1950's, Avrome H. Boshwit, the corporation's principal shareholder and president, discovered he had a heart condition. However, his ability to perform his duties was not impaired, and he was in good health during the years in issue. Upon the event of Avrome H. Boshwit's death, the involved parties intend the corporation to redeem his stock in order to perpetuate the corporation's family-owned status. No written, formal plans to effectuate such a redemption were made during the years in issue. Nor did any of the interested parties make any calculations or projections concerning liabilities, such as taxes and administrative expenses, which would arise when Avrome H. Boshwit died. [18]
*607 During the years in issue, the corporation's principal shareholders had gross income as follows: Shareholder
1973
1974
1975
Avrome H. Boshwit
$ 52,505.85
$ 51,875.89
$ 51,288.20
Buck Boshwit
131,853.19
102,330.69
139,182.85
Jane Horton
11,961.91
11,377.64
13,058.98
No dividends have been declared and paid by the corporation for over thirty years. [19]
In his statutory notice of deficiency, respondent determined the corporation was liable for accumulated earnings tax for 1973, 1974, and 1975. OPINION Section 532 imposes an accumulated earnings tax on every corporation "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed." See sec. 532(a). [20] At issue is whether the petitioner-corporation herein was availed of for that purpose during 1973, 1974 and 1975. *608 The operative fact for imposition of the accumulated earnings tax is existence of the above-noted tax avoidance purpose. However, if a corporation permits its earnings and profits to accumulate beyond the reasonable needs of its business, that purpose is presumed to exist, and the taxpayer-corporation must show the contrary by the preponderance of the evidence to prevail. Sec. 533(a). Thus, our initial inquiry is whether earnings and profits were permitted to accumulate beyond the corporation's reasonable business needs. The corporation advances four grounds for accumulating its earnings and profits, and maintains each such ground represents a reasonable need of its business. The burden is on the corporation to show its accumulations did not exceed the reasonable needs of its business. Rule 142(a), Tax Court Rules of Practice and Procedure.[21]
As a first *609 ground, the corporation asserts it was necessary to accumulate approximately $ 500,000 to renovate and repair its properties given the continuing deterioration of those properties and the increasing vandalism and vacancy rates. [22] While we are convinced the corporation's properties were woefully in need of work, we are unable to find such work fits within the "reasonably anticipated needs" of the corporation's business. [23]
Section 537(a) includes within the reasonable needs of a business, the reasonably anticipated needs of a business. However, section 1.537-1(b)(1), Income Tax Regs., provides: Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an *610 accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. Thus, an indefinitely postponed and vague plan cannot support an accumulation as one for a reasonably anticipated need. Such a plan, if any plan at all, is all the corporation herein had during the years in issue. While the corporate minutes since 1946 routinely cite the need for costly repairs and renovations as the reason for nonpayment of dividends, the fact remains that in over 25 years no major renovation or repair project was undertaken or even planned in any formal manner. No estimate of renovation or repair costs was made during the years in issue, [24] and although building code violations abounded, only basic repairs were made. Any plans the corporation had with respect to this ground were simply too indefinite and too long postponed to support an accumulation. See Herzog Miniature Lamp Works,Inc. v. Commissioner,481 F.2d 857 (2d Cir. 1973), affg. a Memorandum Opinion of this Court. The same result obtains with respect to the corporation's second asserted ground--the *611 necessity to accumulate earnings to redeem Avrome H. Boshwit's stock when he died. While accumulations for redemption may in certain instances be accumulations for reasonable business needs, we are unable to find the corporation showed either any real need for such an accumulation in this case, or any plan of a definite nature to undertake such a redemption. [25] Furthermore, the corporation neither proved or even asserted the amount which would be necessary to accumulate if such purpose did rise to the level of a reasonably anticipated business need. [26]
As a third ground, the corporation asserts it was necessary to accumulate earnings as a self-insurance fund. We agree such a self-insurance fund would usually constitute a reasonable business need justifying accumulation on the facts before us. Self-insurance programs were investigated, an insurance account was established and regularly funded, and standard insurance was obtainable only at a prohibitive cost. See *612 Magic Mart,Inc. v. Commissioner,51 T.C. 775 (1969). However, the corporation has offered us no proof as to how much reasonably could be accumulated for self-insurance purposes. The only evidence we have before us is that deposits averaging about $ 7,000 per year were made to a self-insurance account during the years in issue and that standard insurance would have cost over $ 100,000 per year. The small annual deposits could easily be covered by prior accumulations, and all standard insurance costs tell us that self-insurance would probably cost less. We simply are unable to designate any accumulation as being for the self-insurance program. The corporation's fourth asserted ground is the necessity to accumulate earnings to cover anticipated future losses. While the corporation suffered losses during the four years subsequent to the years in issue, we are unable to find their coverage was a reasonably anticipated need of the corporation in 1973, 1974, or 1975. The corporate minutes during 1973 and 1974 note the Chairman of the Board of Directors as being "highly pleased with [the] operation and showing" made by the corporation. No mention, let alone *613 estimation, of future losses was made. Furthermore, an examination of the corporation's balance sheets and financial statements for 1971 through 1979 reflect a constantly high level of retained earnings and significant working capital each year. In summary, the corporation has not proved its earnings and profits were not permitted to accumulate beyond its reasonable business needs. [27] Thus, the corporation is presumed to have been availed of for the purpose of avoiding income tax on its shareholders by accumulating, rather than distributing, its earnings during the years in issue so as to be subject to the accumulated earnings tax. See secs. 533(a), 531, and 532(a). Only by proving, by the preponderance of the evidence, that such a purpose did not exist, may the corporation overcome that presumption. See sec. 533(a). No such proof has been made. In fact, most factors point to the existence, rather than the absence, of the prohibited purpose. See generally section 1.533-1(a)(2), Income Tax Regs. No dividends were declared or paid for over three decades; loans were made to shareholders; and the two shareholders active in the business, Averome H. *614 Boshwit and Buck Boshwit, occupied high income tax brackets. We conclude the corporation, during the years in issue, fit within the section 532(a) description of a corporation subject to the accumulated earnings tax. [28]
Issue 5. Fairwood Subdivision
FINDINGS OF FACT Sometime in the late 1960's, petitioner Buck Boshwit began developing a housing project known as the Fairwood Subdivision (hereinafter Fairwood). He bought and developed the raw land, and remained Fairwood's sole owner excepting individually sold lots. He *615 planned Fairwood, laid it out with some help from an engineer, did much of the actual building himself, negotiated loans, sold lots, and drafted sales contracts. On his Federal income tax returns for 1975 and 1976, Buck Boshwit reported net income from Fairwood, but included 30 percent of that net income in his maximum tax computation as earned income. In his statutory notice of deficiency, respondent determined none of the Fairwood income was earned income. OPINION At issue is whether any of Buck Boshwit's income from Fairwood is earned income so as to be includible in his section 1348 maximum tax computation. Section 1348(a) provides a maximum rate of 50 percent on "earned taxable income" which is defined as earned income within the meaning of sections 401(c)(2)(C) or 911(b). See sec. 1348(b)(1). Section 911(b) defines earned income as wages, salaries, professional fees, and amounts received as compensation for personal services actually rendered. If a taxpayer is engaged in a trade or business in which both personal services and capital are material income producing factors, a *616 reasonable allowance is considered earned income as compensation for the taxpayer's services. However, the amount treated as earned income cannot exceed 30 percent of the taxpayer's share of the net profits from the trade or business. [29] Respondent maintains none of Buck Boshwit's income from Fairwood is earned income. Petitioner maintains 30 percent of that income is earned income. We agree, in part, with petitioner Buck Boshwit. Stated simply, we believe Buck Boshwit's testimony that his personal services with respect to Fairwood were extensive. However, he attempted no proof as to the exact value of those services. Bearing heavily against him whose inexactitude is of his own making and applying the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), we find 20 percent of the net income from Fairwood is attributable to Buck Boshwit's personal services, is earned income, and is includable in his maximum tax computation. To reflect the foregoing, Decision will be entered for petitioner if Docket No. 3839-80.
Decisions will be *617 entered under Rule 155 in Docket Nos. 12193-77, 3840-80, and 3841-80.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Avrome H. Boshwit and Mary E. Boshwit, docket No. 3839-80; Buck Boshwit and Judith S. Boshwit, docket No. 3840-80; and Boshwit Brothers, Inc., docket No. 3841-80.↩
2. On brief, respondent withdrew from his earlier position that monies flowing to Buck Boshwit in 1975 and 1976 were dividends to Avrome H. Boshwit.↩
3. The space filled by a * represents a figure unclear from the evidence before us.↩
4. See generally Nakayama v. Commissioner,T.C. Memo. 1975-143↩.
5. Those spaces filled by a * represent figures unclear from the evidence before us.↩
6. The interest payments actually were made by the Boshwit Bros. Rental Agency, Buck Boshwit's sole proprietorship.↩
7. Respondent concedes the corporation is entitled to a $ 2,801.17 interest deduction in 1976. Unless otherwise provided, all section references are to the Internal Revenue Code of 1954, as amended.↩
8. Given the number of units involved, a parcel by parcel inspection to arrive at an exact amount would have been too costly to have been undertaken. But, not even a formal estimate was made. At trial, Buck Boshwit estimated it would cost "better than a half a million dollars" to do necessary repairs and renovations. ↩
9. According to the corporation's unaudited financial statements, the corporation spent approximately $ 55,000 to $ 78,000 each year on general repairs, plumbing repairs, and decorating and painting from 1972 through 1979. In none of those years, is an unusually large amount noted.↩
10. The corporation did discuss the aspects of self-insurance with Maynard Evensky, an experienced Memphis insurance man.↩
11. According to the records before us, deposits, exclusive of earnings, totaling approximately $ 6,000, $ 5,000, and $ 10,000 were made to the Leader account during 1973, 1974, and 1975, respectively. ↩
12. Boshwit Brothers Finance Corporation is petitioner Buck Boshwit's wholly-Owned corporation.↩
13. As calculated in the corporation's unaudited financial statements, net losses include depreciation and taxes.↩
14. According to respondent's figures, not objected to by petitioner-corporation, current assets exceeded current liabilities by over $ 200,000 during each of the years in issue. Such would seem to denote lower working capital figures than those shown in the corporation's unaudited financial statements. See text, infra.↩
15. Working capital figures are rounded to the nearest dollar. ↩
16. The 1977 financial statement puts working capital at $ 562,861. However, the 1978 financial statement lists 1977 working capital at $ 380,588. No explanation for such discrepancy is evident.↩
17. Retained earnings for 1972, 1973, 1974, and 1975 were $ 1,237,197.46, $ 1,297,429.48, $ 1,322,787.04, and $ 1,350,893.37, respectively. Thus, the amount added to retained earnings was approximately $ 60,000, $ 25,000, and $ 28,000 during 1973, 1974, and 1975.↩
18. The corporation owned three life insurance policies on the life of Avrome H. Boshwit with a total face amount of $ 100,000.↩
19. In 1965, 1966, and 1967, certain distributions were determined by respondent to be constructive dividends.↩
20. Sec. 532(b)↩ excepts certain corporations from the accumulated earnings tax. None of its exceptions applies herein.
21. The corporation did not file a sec. 534(c) statement. Thus, the burden-shifting rule of sec. 534(a)(2) does not apply herein.↩
22. The corporation asserts renovation and repairs as two separate needs. However, they are integrally related, and we treat them as one. ↩
23. The corporation makes no arguments concerning regularly-made repairs or operating cycles.↩
24. The $ 500,000 asserted estimate was made by Buck Boshwit at trial.↩
25. Sec. 537(a)(2)↩ relating to sec. 303 redemption needs is inapplicable herein. 26. The corporation does maintain generally that any of its asserted grounds was sufficient to justify its entire accumulation.↩
27. Even if the corporation had proved plans of sufficient definiteness to fall within sec. 537(a)↩, we would still be in the position of having to make this holding. Almost no proof was forthcoming as to the amount of any necessary accumulation. Without that, given large accumulations in prior years, we could not find otherwise. 28. Various concessions will affect the actual computation of the amount of the sec. 531 tax under sec. 535. For example, see note 6, supra. However, we note the amounts determined herein to be dividends to Buck Boshwit, see supra,↩ pp. 9-10, do not qualify for the sec. 561 dividends paid deduction. Sec. 562(c).
29. Apparently petitioner concedes capital was a material income-producing factor with respect to Fairwood.↩